1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   BARRY LOUIS LAMON,                          )   Case No.: 1:09-cv-00484-AWI-SAB (PC)
                                                 )
12                    Plaintiff,                 )
                                                 )   FINDINGS AND RECOMMENDATIONS
13          v.                                   )   REGARDING PARTIES MOTIONS FOR
                                                 )   SUMMARY JUDGMENT
14   MAURICE JUNIOUS, et al.,                    )
                                                 )   [ECF Nos. 116, 118]
15                    Defendants.                )
                                                 )
16   _____          )

17          Plaintiff Barry Louis Lamon is appearing pro se and in forma pauperis in this civil rights action

18   pursuant to 42 U.S.C. § 1983.

19                                             **I.**

20                                    **RELEVANT HISTORY**

21          This action is proceeding against Defendants Talisman, Magvas, and Osborne for retaliation in

22   violation of the First Amendment.[1]

23          On February 5, 2015, Plaintiff filed a motion for summary judgment.  (ECF No. 116.)

24   Defendants filed an opposition to Plaintiff's motion on February 26, 2015.  (ECF No. 120.)

25

26   _____

27   [1] Defendants Barda and Cohen were dismissed from the action.  (See ECF Nos. 85, 119.)  In addition, Plaintiff's due
     process and deliberate indifference claims were dismissed from the action for failure to state a cognizable claim for relief.
     (ECF Nos. 23, 31)  To the extent Plaintiff references Defendants Barda and Cohen and a due process or deliberate
28   indifference claim, the Court does not consider such arguments and/or evidence as those issues are not before the Court.

On February 17, 2015, Defendants filed a motion for summary judgment.[2]  (ECF No. 118.) Plaintiff filed an opposition on May 4, 2015.  (ECF Nos. 127, 128, 129, 130.)  Defendants filed a reply on June 1, 2015.  (ECF Nos. 136, 137.)

**II.**

**LEGAL STANDARD**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence.  Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him.  Soremekun v. Thrifty Payless, Inc., 509 F.3d

---

[2] Plaintiff objects to the submission of Defendants' statement of undisputed fact on June 11, 2015 as untimely and moves to strike them from the record.  Defendants filed a response to Plaintiff's objections on July 6, 2015.  (ECF No. 140.) Plaintiff's objection is overruled.  Defendants submit that on June 11, 2015, they realized for the first time that their separate statement of undisputed facts in support of their motion for summary judgment had inadvertently (due to an administrative error) not been filed with the Court or served on Plaintiff.  Defendants filed their motion for summary judgment on February 17, 2015, and provided notice therein of the undisputed facts in support of their motion, along with all of the evidence relied upon in their motion for summary judgment which included declarations, medical records, documents from Plaintiff's central file, and other supporting documentation.  Although Defendants inadvertently did not submit a separate statement of undisputed facts until June 11, 2015, there is no prejudice to Plaintiff as he was on clear notice of such facts at the time Defendants filed their motion on February 17, 2015.  Indeed, on May 4, 2015, Plaintiff's filed a statement of facts in response to Defendants' statement of undisputed facts, and Plaintiff does not take issue with any of Defendants' evidence but rather only moves to strike Defendants' separate statement of undisputed facts.  (ECF No. 128.)  Thus, because Plaintiff was clearly on notice of the Defendants' statement of undisputed facts prior to filing his opposition and there is no resulting prejudice, Plaintiff's objections and motion to strike shall be denied.

978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

**III.**

**DISCUSSION**

**A.      Evidentiary Objections**

Any party may object to the other's evidence on the ground that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). As long as the requirements of Rule 56 are satisfied, the evidence submitted is not required to be in a form that would be admissible at trial. Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001).

Defendants raise objections and move to strike several portions of Plaintiff's declaration submitted in support of his motion for summary judgment, and the inmate witness declarations of Jason Thomas, Yusef Eskridge, Louis Jackson, and Dean Drake. (ECF No. 120.)

Defendants raise objections and move to strike several portions of Plaintiff's declaration submitted in opposition to their motion, Exhibit 2 (CDCR Form 22, Inmate/Parolee Request for Interview, Item or Service), the declaration of several inmate witnesses, and Exhibit 11 (article from Prison Focus entitled "The Corcoran Report on SHU Conditions.") (ECF No. 137.)

1.      Plaintiff's Declaration

Defendants object to Plaintiff's declaration, paragraphs 5, 8, and 9 as irrelevant under Rule 402 of the Federal Rules of Evidence. Defendants object to paragraph 10 under Rules 701 and 702 of the Federal Rules of Evidence as improper medical opinion as to his own medical condition. Defendants

also object to paragraph 13 for lack of personal knowledge and foundation under Rule 602 of the Federal Rules of Evidence.

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. <u>Burch v. Regents of Univ. of California</u>, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). The Court need not consider Defendants' objections to this evidence as such objections are succumbed in the summary judgment standard itself.

As a lay witness, Plaintiff may only testify as to matters which are rationally based on his perception, helpful in determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701.

In paragraph 10 of his declaration, Plaintiff declares "I do not deny that I have a mental illness. Though I categorically dispute that I have ever sincerely been suicidal or ever have significantly injured myself or otherwise sustained any serious physical injuries during any of my so-called suicide attempts and had not even made a staged or alleged attempt for more than five years." (ECF No. 130.) Defendants' objection to this paragraph is GRANTED in part and OVERRULED in part. Plaintiff may testify as to his belief that he was never suicidal or suffered a physical injury as a result from suicide attempts. However, Plaintiff may not testify as to any matters which require medical expertise. Such matters include that Plaintiff suffers from a mental illness and the extent and symptoms of such mental illness. These are matters outside of those which lay witnesses may testify; they require the testimony of a medical expert.

As to paragraph 13 of Plaintiff's declaration relating to experiences of other prisoners, such evidence is not relevant and need not be considered for purposes of deciding the instant motion.

2.    <u>CDCR Form 22-Inmate/Parolee Request for Interview, Item or Service</u>

Defendants object to Exhibit 2 to Plaintiff's declaration in support of his opposition to Defendants' motion for summary judgment, Inmate/Parolee Request for Interview, Item or Service (CDCR Form 22), dated September 21, 2011, as irrelevant, lack of personal knowledge and

4

foundation, speculation and states legal conclusions that are improper opinion testimony.  (Lamon Decl., Ex. 2; ECF No. 130 at 45.)

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here.  Burch v. Regents of Univ. of California, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). The Court need not consider Defendants' objections to this evidence as such objections are succumbed in the summary judgment standard itself.

3.     Declarations by Inmate Witnesses

Defendants object to the declarations of inmate witnesses in support of Plaintiff's opposition to Defendants' motion for summary judgment on the grounds that they have irrelevant, lack foundation in personal knowledge and constitute improper opinion testimony under Rule 56(c)(4) of the Federal Rules of Civil Procedure and Rules 602 and 701 of the Federal Rules of Evidence.

Defendants' objections to the declarations of inmate witnesses Thomas, Stevens, McGinnis, Malone, Evans, Loving, Harris, Jackson, Eskridge and Drakes are SUSTAINED.  The declarations do not contain "evidence … sufficient to support a finding that the witness has personal knowledge" of the events at issue in this action, and these declarations will not be considered as evidence in deciding the cross-motions for summary judgment.

As to the declarations by inmates Thomas, Stevens, McGinnis, Malone, Evans, Loving, and Harris, these declarations were provided in support of a wholly different lawsuit, Lamon v. Dir. of the Cal. Dep't of Corr. and Rehab., 2:06-cv-00156. (ECF No. 116, Attach. 1; ECF 130, Exs, 1, 6, 7.)  In addition, these declarations do not concern any of the Defendants in this action.  Furthermore, the declarations by Stevens, McGinnis, Malone, Evans, Loving, and Harris were all signed prior to the time the events at issue in this case took place.  Thus, these declarations are not relevant to any claim or defense at issue in this case and will not be considered in ruling on the cross-motions for summary judgment.

As to the declaration of inmate Louis Jackson, Jackson states that he was moved into housing unit 4A1R at Corcoran on March 5, 2009, which is after the alleged events at issue in this case took place.  (ECF No. 116, Attach. 3; ECF No. 130, Ex. 9.)  In addition, the claim at issue in this case concerns incidents alleged to have taken place in housing unit 4B2R and the Acute Care Hospital, not 4A1R.  Furthermore, the declaration concerns the actions of non-parties, not the Defendants in this case.

As to the declaration of inmate Eskridge, the declaration was provided in support of <u>Lamon v. Adams</u>, 1:07-cv-00824, not the instant case.  (ECF No. 116, Attach. 2; ECF No. 130, Ex. 8.)  In addition, as previously noted, the instant action involves incidents alleged to have taken place in unit 4B2R and the Acute Care Hospital at Corcoran, however, inmate Eskridge states that he lived in unit 4A1R.  Thus, such declaration does not contain relevant information to this action.  Furthermore, this declaration concerns the actions of non-parties, no the defendants in this case.

As to the declaration of inmate Drake, Drake's declaration indicates that he arrived at Corcoran on April 10, 2008, after the alleged events at issue in this case took place.  (ECF No. 116, Attach. 4; ECF No. 130, Ex. 10.)  In addition, Drake declares that he has been housed in housing unit 4A4R the entire time he has been at Corcoran; however, the instant case involves incidents which allegedly took place in housing unit 4B2R and the Acute Care Hospital.  Furthermore, the declaration concerns the actions of non-parties who are not Defendants in this case.

For the foregoing reasons, Defendants' objections to the inmate declarations submitted by Plaintiff in support of his motion for summary judgment and opposition to Defendants' motion for summary judgment are sustained and such declarations will not be considered as evidence in deciding the instant motions.

4.    <u>Article from Prison Focus</u>

Defendants object to Exhibit 11 to Plaintiff's declaration, which contains an article from Prison Focus entitled "The Corcoran Report on SHU conditions," as irrelevant and hearsay.   Fed. R. Evid. 402, 801, 802.

Defendants' objection to Exhibit 11 is SUSTAINED.  This article does not concern the Defendants in this action or any of the alleged events underlying this lawsuit.  In addition, this article

relates to conditions in the Security Housing Unit at Corcoran State Prison between 2009 and 2010, after the events underlying this action are alleged to have taken place.  Further, this article constitutes an out-of-court statement presented for the truth of the matter asserted therein which is improper hearsay evidence.

**B.      Summary of Plaintiff's Allegations[3]**

According to the allegations of the First Amended Complaint, Plaintiff contends that prior to February 19, 2008, Defendants were aware of the existence of a shadow policy of retaliation and a code of silence among prison personnel at Corcoran State Prison.  Pursuant to the shadow policy, correctional officers and staff routinely and systematically retaliated against inmates for assaulting prison staff, filing grievances, lawsuits or complaints, or based on any matter related to an inmate's prison records which induced anger to staff.  These inmates were subjected to "unnecessary physical beatings, malicious property deprivations, sadistic and pain-inflicting food tainting," and housing assignments that compromise their safety.   In an effort to escape such abuse, the targeted inmates routinely complain of false and non-existence mental and physical illnesses in order to gain entry to Corcoran's Acute Care Hospital, where they pretend to be ill in hopes that their cells will be given away and they will be reassigned to different housing units.  Plaintiff contends that he was a victim of the "shadow policy," and his food was poisoned and he was deprived of his property.  Plaintiff feigned suicide on more than ten occasions to escape the abuse, but he was instead subjected to falsification of his mental health records and involuntary and unnecessary psychiatric drug treatment.

///

///

///

///

///

---

[3] Plaintiff's amended complaint is verified and therefore, it must be treated as an opposing declaration to the extent it is based on Plaintiff's personal knowledge of specific facts which are admissible in evidence.  Jones, 393 F.3d at 923.  This subsection is merely a summary of Plaintiff's legal claim as pled and the recitation of factual allegations herein does not represent a finding as to the admissibility of the allegations as evidence.

**C.      Undisputed Facts[4]**

1.      Plaintiff is in the custody of the California Department of Correction and Rehabilitation (CDCR).

2.      Plaintiff was transferred to California State Prison-Corcoran on February 23, 2006.

3.      At all times relevant to this action, Plaintiff was housed at California State Prison-Corcoran, where Defendants Dr. Talisman, DR. Osborne, and officer Magvas were employed.

4.      At all times material to the claims in this action, Defendant Magvas was employed as a corrections officer at California State Prison-Corcoran.

5.      At all times material to the claims in this action, Defendant Talisman was employed as a staff Psychiatrist at California State Prison-Corcoran.

6.      At all times material to the claims in this action, Defendant Osborne was employed as a staff Psychologist at California State Prison-Corcoran.

7.      Dr. Talisman and Dr. Osborne were both assigned to the in-patient psychiatric unit at the John D. Klarich Memorial (JDKM) Hospital, which is also known as the Acute Care Hospital.

8.      At all times material to this action, Defendants Osborne and Talisman were employed as mental health treatment staff at California State Prison-Corcoran and, as such, were regularly assigned to work in the Acute Care Hospital (ACH) where they had no personal access to Plaintiff's regularly-assigned cell housing.

9.      Plaintiff frequently visited the in-patient psychiatric unit at the JDKM Hospital beginning almost immediately upon his transfer to Corcoran.

10.      Officer Magvas was the floor officer assigned to housing unit 4B2R at Corcoran.

11.      Plaintiff was housed in unit 4B2R at Corcoran from June 13, 2006 through August 9, 2007, and from September 19, 2007 through March 4, 2008.

12.      The 4B unit at Corcoran is a Security Housing Unit (SHU).

---

[4] These facts are derived from both parties' statement of undisputed facts submitted in support of their motion for summary judgment where not in dispute. **Error! Main Document Only.**Contentions set forth in verified pro se pleadings, motions, and/or oppositions constitute evidence where the contentions are based on personal knowledge of facts admissible in evidence. <u>Jones v. Blanas</u>, 393 F.3d 918, 922-23 (9th Cir. 2004).

8

13. The inmates living in this unit are classified as level-four maximum custody inmates, which is the highest level of security in the California prison system.

14. Inmates housed in the SHU have been found guilty in disciplinary proceedings of committing acts of violence against staff or other inmates, possessing or distributing illegal narcotics and other contraband, associating with or belonging to a gang, promoting illegal gang activity, or engaging in other activity or conduct that threatens the safety and security of the institution, staff, and inmates that makes them ineligible for housing in the general population.

15. Plaintiff has a well-documented history of mental illness.

16. Plaintiff suffers from schizoaffective disorder, dating back to his adolescence.

17. A person with schizoaffective disorder experiences the psychotic symptoms of schizophrenia in combination with the symptoms of a mood disorder.

18. Schizoaffective disorder is characterized by delusions, or false, fixed beliefs with no basis in reality (that a person refuses to give up, even when presented with factual information), paranoid thoughts and ideas, major depressed mood episodes, and suicidal thoughts or behavior.

19. The course of the disorder usually features cycles of severe symptoms, followed by a period of improvement, with less severe symptoms.

20. Due to his schizoaffective disorder diagnosis, Plaintiff has long been a participant in CDCR's Mental Health Services Delivery System (MHSDS), which provides mental health services to inmates who, like Plaintiff, have been diagnosed with a serious mental disorder.

21. The MHSDS is designed to provide an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment.

22. Four different levels of care are offered in the MHSDS.

23. The Correctional Clinical Case Management System (CCCMS) is the least restrictive level of care in the MHSDS.

24. CCCMS inmates receive ongoing treatment, including clinician contact no less than every 90 days, annual assessment by their Interdisciplinary Treatment Team (IDTT) and, if prescribed medication, psychiatric contact no less than every 90 days.

9

25.     Inmates assigned to the more restrictive Enhanced Outpatient Program (EOP) include those with acute onset or significant decompensation because of a serious mental disorder and are generally unable to function in the prison.

26.     EOP inmates often exhibit disruptive behavior and impairment in the activities of daily living.

27.     EOP inmates meet with an IDTT at least every 90 days to re-evaluate their treatment plan and progress, meet weekly with their primary clinician, either individually, or in group psychotherapy, receive individual clinical contact at least every other week, and are seen by a psychiatrist at least once per month.

28.     The most restrictive level of care within a CDCR institution is a Mental Health Crisis Bed (MHCB).

29.     The MHCB provides short term (less than 10 days) inpatient treatment to patients exhibiting significant impairment and dysfunction, who require 24-hour nursing care, and present a danger to themselves or others.

30.     MHCB inmates are monitored daily by their primary clinician, and they meet with an IDTT at least once a week, are evaluated by a psychiatrist at least twice a week, and receive 24-hour nursing care and intensive therapy and rehabilitation as needed.

31.     An inmate whose mental health care needs are so serious that they cannot be treated in the outpatient setting or in a short term MHCB placement are assigned to the Intermediate or Acute Levels of Care (ILC or ALC), and are sent for long term inpatient psychiatric care at a Department of Mental Health facility.

32.     While in CDCR's custody, Plaintiff has consistently cycled through all four levels of care offered by the MHSDS.

33.     Plaintiff complained often regarding his suspicions that custody staff was tampering with or poisoning his food in retaliation for his litigation activities as well as his numerous complaints about staff.

34.     Prior to Plaintiff's arrival at Corcoran, he was under the belief that staff at California State Prison, Sacramento were tampering with and poisoning his food.

35.     Plaintiff's complaints regarding his food can be attributed to his schizoaffective disorder diagnosis, as such paranoid and delusional fixed beliefs are a classic symptom of the disorder.

36.     In Dr. Talisman's experience, it is not uncommon for inmate-patients suffering from schizophrenia spectrum disorders, like Plaintiff, to believe that custodial staff members are "out to get them."

37.     Many of Dr. Talisman's mental health inmate-patients have accused correctional officers of trying to poison them by putting liquid detergent on other types of harmful substances in their meals.

38.     During 2006 and 2008, Plaintiff vacillated between medication complaint and refusing his prescribed psychotropic medications—which included Risperidone (Risperdal) and Olanzepine (Zyprexa).

39.     Plaintiff regularly expressed suicidal ideations between 2006 and 2008.

40.     Plaintiff was placed into a MHCB almost immediately upon his transfer to Corcoran.

41.     The reason for this placement was because Plaintiff attached a homemade noose to the vent in his cell and threatened to hang himself.

42.     This was not the first time Plaintiff has attempted suicide; in 1992, he attempted suicide by setting his cell on fire.

43.     Plaintiff's medical history also indicates that he has previously attempted suicide by hanging, swallowing razor blades, driving a car into a wall, and jumping from a freeway overpass.

44.     Plaintiff's repeated suicidal ideations can be attributed to his schizoaffective disorder diagnosis.

45.     Plaintiff visited the In-Patient Psychiatric Unit at the JDKM numerous times between 2006 and 2008, and he was evaluated by a number of mental health professionals, including Dr. Talisman and Dr. Osborne, during this time, both as an inpatient and outpatient.

46.     Dr. Talisman treated Plaintiff directly several times during this time period.

47.     Even when Dr. Talisman did not directly treat Plaintiff, he had occasion to interact with Plaintiff often during his frequent visits to the JDKM Hospital, and thus was very familiar with Plaintiff's mental health records, and his mental health diagnosis and treatment history.

48.     Between Plaintiff's arrival at Corcoran on February 23, 2006, and January 22, 2008, when procedures to involuntarily medicate him were initiated, Plaintiff was transferred to a MHCB for suicidal or homicidal ideations fourteen times.

49.     The majority of treatment Dr. Osborne provided to Plaintiff between 2006 and 2008 occurred when she met with Plaintiff to discharge him from the MHCB and to order follow-up treatment for him upon his discharge.

50.     Dr. Osborne also authorized admitting Plaintiff to a MHCB on November 5, 13, and 20, 2007, and January 21, 2008.

51.     On June 12, and August 6, 2007, Dr. Osborne evaluated Plaintiff and referred him to a Department of Mental Health facility because he was exhibiting extremely paranoid, bizarre delusions regarding his food, and Dr. Osborne believed Plaintiff needed inpatient psychiatric treatment to decrease his paranoia, increase his comprehension of reality, and to eliminate his thoughts of suicide.

52.     On February 21, 2008, Plaintiff refused his psychotropic medication.

53.     At 10:38 a.m., on February 22, 2008, Plaintiff met with his IDTT to discuss his treatment plan.

54.     The team consisted of Psychiatrists Dr. Zakari and Dr. Cohen, Licensed Clinical Social Worker Jordin, Psychologist Dr. Stokes, and Registered Nurse Carpio.

55.     Dr. Talisman and Dr. Osborne were not members of this team, and were not present.

56.     At approximately 10:50 a.m., Dr. Cohen discontinued Plaintiff's prescription for Risperdal and replaced it with Zprexa.

57.     Dr. Cohen noted that Plaintiff posed a risk of danger to himself and to others.

58.     Accordingly, Dr. Cohen ordered Plaintiff to be placed in five-point restraints so that emergency medication could be given, and that he be released when his behavior calmed and he no longer posed a risk of danger.

59.     Plaintiff was released from the restraints at approximately 4:05 p.m. that afternoon and moved to a MHCB, where he was monitored by nursing staff.

60.     Dr. Talisman and Dr. Osborne played no role in the decision involuntarily mediate Plaintiff or place him in restraints on February 22, 2008.

61.     At approximately 7:30 a.m. on February 24, 2008, nursing staff noted that Plaintiff once again expressed suicidal ideations, and that he was at risk for self injury.

62.     On February 25, 2008, Dr. Cohen extended Plaintiff's involuntary medication order by twenty-one days, which Dr. Talisman approved.

63.     That day, Plaintiff again met with an IDTT which consisted of Dr. Talisman, Dr. Cohen, Dr. Stokes, Registered Nurse Camarena, and Correctional Counsel II Trimble.

64.     Dr. Osborne was not a member of this team.

65.     At that time, the team decided that the Keyhea process should be initiated.

66.     In other words, CDCR would petition for a court order authorizing long term involuntary psychotropic medication for Plaintiff.

67.     The team believed that, as a result of his schizoaffective disorder, Plaintiff was a danger to himself and not competent to refuse medication.

68.     Dr. Osborne played no role in the determination that the Keyhea process should be initiated.

69.     Dr. Osborne has never prescribed any medication for Plaintiff, or ordered that he be involuntarily medicated.

70.     As a clinical psychologist, Dr. Osborne is not authorized to prescribe medication or order involuntarily medication for a patient.

71.     In the year 2007, Plaintiff filed a complaint No: G567918 with the California Victims Compensation Board against the Corcoran Treatment Team (ACH IDTT) collectively and Defendants Talisman and Osborne, individually, alleging that they were conspiring with other Corcoran staff and participating in a scheme to misreport my (and other inmates) complaints about staff misconduct as proof of the existence of and/or the manifestation of symptoms of mental illness to discredit our otherwise legitimate claims of abuse by staff, and subsequently, shelter the miscreant staff from discipline they would be exposed to without such sheltering.

72.     On February 26, 2008, Dr. Talisman met with Plaintiff, who believed that the Keyhea process was being initiated against him in retaliation for a federal lawsuit he had just filed.

13

73.     Later that day, the Keyhea certification officer determined there was sufficient grounds to proceed with the Keyhea hearing.

74.     Working with counsel for CDCR, Dr. Talisman assisted with the preparation of a Petition for Judicial Determination re: Involuntary Medication, and he provided a declaration in support of the petition.

75.     Dr. Talisman also testified in person at the Keyhea hearing on April 2, 2008, and expressed his opinion that Plaintiff should be involuntarily medicated.

76.     Plaintiff also testified at the hearing.

77.     On April 2, 2008, following the hearing, the Keyhea petition was granted.

78.     After weighing all of the testimony, the administrative law judge determined that Plaintiff posed a danger to himself, and ordered that he be involuntarily medicated for a period of 180 days, or through September 29, 2008.

79.     Dr. Osborne has never testified of any type of hearing regarding whether Plaintiff should be involuntarily medicated.

80.      As a floor officer in unit 4B2R, officer Magvas was responsible for facilitating the daily routine of the SHU inmates, including feeding, maintaining the safety and security of the unit, and supervising the inmates and their movement within the unit.

81.     Officer Magvas did not have any authority over inmate cell assignment, nor was he authorized to make any decisions about how long an inmate's cell would be retained or when it would be reassigned when the inmate temporarily left the housing unit for a court appearance or because he was hospitalized.

82.     As a floor officer in unit 4B2R, officer Magvas was required to conduct three random cell searches every day, and has probably searched every 4B2R inmate's cell on at least one occasion.

83.     If an inmate were unexpectedly removed from the housing unit for an extended period of time, the building sergeant would sometimes ask officer Magvas to inventory and box the inmate's property for storage so that the bed and/or cell could be reassigned.

84.     Any contraband discovered during an ordered inventory would be confiscated pursuant to CDCR's rules and regulations.

14

85.     All non-contraband property would be stored and reissued to the inmate upon his return to the housing unit.

86.     On February 21, 2008, the building sergeant ordered officer Magvas to inventory and box Plaintiff's property.

87.     Importantly, appliances that have been altered in any way are considered contraband.

88.     When officer Magvas inventoried Plaintiff's cell on February 21, 2008, he completed a property inventory form.

89.     On the form, officer Magvas noted that all of the buttons on Plaintiff's television had been altered.

90.     Officer Magvas also noted on the form that he boxed up Plaintiff's legal and personal papers, as well as food, clothing, and canteen items.

91.     On April 15, 2008, Plaintiff filed an inmate appeal in which he complained that when officer Magana reissued the property that was boxed and inventoried from Plaintiff's cell on February 21, 2008, some of his property was missing or had been confiscated.

92.     Plaintiff complained that his television, vitamins, television cable, 1500 pages of legal work, some of his personal books, eyeglasses case, religious diet cards, and 250 pages of his unit health record were missing.

93.     At both the first and second level of review, Plaintiff was informed that his television was confiscated because the buttons had been altered, his television cable was confiscated because it was contraband screw-on model, he was issued five books (the maximum permitted by the rules and regulations), his vitamins were confiscated because they were loose in a cup and could not be identified by staff.

94.     Plaintiff's issued property form shows that officer Magana, not officer Magvas, confiscated all property items, including those listed above, on April 7, 2008.

95.     For regular meals, once the food is prepared, it is delivered to each housing unit in large pans.

96.     The officers on duty then put the food on individual meal trays.

15

97.     Both the Kosher and regular meal trays are stacked onto meals carts for delivery to the inmates.

98.     The officers then deliver a meal tray from the cart to each inmate in his cell.

99.     Multiple officers are involved with the distribution of the meal trays simultaneously, so that all of the SHU inmates receive their food in a timely and efficient manner.

100.    Plaintiff received both regular and Kosher meals when he was housed in unit 4B2R.

101.    Plaintiff threw his meal under the door on his tier.

102.    Because Plaintiff had engaged in this type of behavior numerous times previously, officer Magvas authored a general counseling chrono documenting this incident and recommending that Plaintiff be evaluated by mental health staff.  Officer Magvas also reported that Plaintiff was suicidal.[5]

103.    Officer Magvas does not recall Plaintiff ever reporting to him that he was suicidal.[6]

104.    Officer Magvas takes an inmate's suicidal ideations very seriously because it is impossible to know whether such ideations are sincere.

105.    If an inmate reported to officer Magvas that he felt suicidal, officer Magvas would immediately remove the inmate from his cell, escort him into the rotunda of the housing unit, and notify the psychiatric technician on duty so that that the inmate could be further evaluated.

106.    Plaintiff initially filed a federal civil rights action in <u>Lamon v. Tilton</u>, Case No. 1:07-cv-00492-AWI-DLB in the United States District Court for the Eastern District of California.

---

[5] In Defendants' statement of undisputed fact, Number 138, Defendant Magvas submitted that he "did not report that Plaintiff was suicidal.  (ECF No. 138 ¶ 138., citing Magvas Decl. ¶ 15.)  However, Defendant Magvas submitted a supplemental declaration on February 26, 2015, in which he declares that subsequent to the filing of the initial declaration, Magvas "discovered a chronological interdisciplinary mental health progress note bearing my signature in which I reported to Psychiatric Technician A. Morris that at approximately 9:00 a.m. on February 21, 2008, [Plaintiff] stated to me that he was suicidal, that he needed help, and that he needed to talk to someone."  (ECF No. 120, Supp. Decl. of Magvas ¶ 2.)  Thus, this fact is now undisputed for purposes of the instant motions.

[6] Notwithstanding the subsequent discovery of the February 21, 2008, mental health progress note dated February 21, 2008, Magvas still declares that he does "not expressly recall [Plaintiff] expressing suicidal ideations on February 21, 2008, but this chrono is consistent with my practice to immediately remove a suicidal inmate form his cell, escort him to the rotunda of the housing unit, and notify the psychiatric technician on duty so that the inmate could be further evaluated." (ECF No. 120, Supp. Decl. of Magvas ¶ 3.)

107.     On February 19, 2008, Plaintiff mailed an amended complaint in <u>Lamon v. Tilton</u>, Case No. 1:07-cv-00492-AWI-DLB.

108.     On numerous occasions prior to February, Plaintiff visited the ACH and informed Defendants Osborne, Talisman, and the IDTT that he was being subjected to a broad pattern of retaliation by staff due to my filing of internal prison grievances and petitioning the government for other redress of his grievances.  Plaintiff attempted to give Osborne, Talisman and others on the IDTT the declarations of inmates that corroborated his own claims; they vigorously refused to accept the declarations.

**D.     Retaliation**

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  <u>Watison v. Carter</u>, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009)).  Also protected by the First Amendment is the right to pursue civil rights litigation in federal court without retaliation.  <u>Silva v. Di Vittorio</u>, 658 F.3d 1090, 1104 (9th Cir. 2011).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005).

Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence.  <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1288-1289 (9th Cir. 2003).  However, mere speculation that defendants acted out of retaliation is not sufficient.  <u>Wood v. Yordy</u>, 753 F.3d 899, 904-905 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew of plaintiff's prior lawsuit or that defendants' disparaging remarks were made in reference to prior lawsuit).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'"  <u>Pratt v. Rowland</u>, 65 F.3d 802, 806 (9th Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate

deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  Id. (quoting Sandin, 515 U.S. at 482).

### E.    Summary of Plaintiff's Motion[7]

In his motion for summary judgment, Plaintiff contends that Defendants Magvas, Osborne and Talisman maintained, promulgated, and enforced a longstanding and still prevailing custom of punishing, threatening, and intimidating inmates to deter them from filing internal prison grievances, petitioning the government for redress and otherwise suppress inmate complaints against prison staff. (Motion, at 1; Lamon Decl. ¶ 5.)

On February 19, 2008, Plaintiff filed an amended complaint in Lamon v. Tilton, and the very next day Defendant Magvas angrily called Plaintiff a "snitch."  (Motion at 3: Lamon Decl. ¶¶ 12-13.) Thereafter, Defendant Magvas refused to allow Plaintiff the opportunity to speak with his supervisor and his primary clinician and instead told Plaintiff he wasn't going to talk to anyone because he was getting his "whining" bitch ass out of his building once and for all.  (Motion at 3; Lamon Decl. ¶ 14.)

On February 21, 2008, Plaintiff observed Defendant Magvas cajole, coerce and otherwise conspire with a Licensed Psychiatric Technician to have Plaintiff removed from building 4B2R and admitted to the ACH mental health crisis bed unit (MHCU) based on the false report by Magvas that Plaintiff claimed to be feeling suicidal.  (Motion at 3; Lamon Decl. ¶ 15.)  In support of this claim, Plaintiff submits a CDCR chronological interdisciplinary progress note by Magvas dated February 21, 2008.  The progress note was created by Magvas during the performance of his routine day to day duties with the CDCR.  (Id.)

Plaintiff personally observed Magvas strip all of Plaintiff's property out of his cell and package it for storage.  (Motion at 6.)

On numerous occasions prior to February 22, 2008, Plaintiff informed Defendants Osborne and Talisman of his unwillingness to accept "liquid" or other visually-unidentifiable forms of medication

---

[7] In his motion for summary judgment, Plaintiff contends incorrectly that this action proceeds against Defendants Barda and Cohen, who as previously stated have been dismissed from the action.  Plaintiff also contends incorrectly he is proceeding on claims for assault, battery, denial of equal protection under the law, intentional infliction of wanton and unnecessary pain, conspiracy, interference with his access to court, and deliberate indifference to a substantial risk of serious harm.  (ECF No. 11.)  However, as previously stated, this action proceeds solely on Plaintiff's First Amendment claim of retaliation against Defendants Talisman, Magvas and Osborne.

due to the pervasiveness of the custom at Corcoran to retaliate against or otherwise interfere with inmates attempting to use the courts.  (Motion at 2; Lamon Decl. ¶ 19.)

During his admission to the ACH in February 2008, Plaintiff was calm, quiet, and rational. Plaintiff denied being suicidal and explained that Magvas retaliated.  (Motion at 2; Lamon Decl. ¶ 20.) Plaintiff denied ever feeling suicidal and explained Magvas's retaliation.

On numerous occasions prior to February 21, 2008, Plaintiff informed Defendants that he was being subjected to a broad pattern of retaliation by correctional officers at the prison.  Plaintiff informed them of other inmates who complained of similar abuses and attempted to give them written declarations from the other inmates.  (Motion at 2; Lamon Decl. ¶ 20.)  Plaintiff attempted to give Defendants Osborne, Talisman and the IDTT declarations by other inmates and other evidence to support his claims of staff abuse and Plaintiff was informed that if he wanted their help it would need to be couched in "mental health terms."  (Motion at 2; Lamon Decl. ¶ 21.)

On the morning of February 22, 2008, Defendants Magvas, Osborne and Talisman were openly hostile and angry toward Plaintiff and immediately commented about Plaintiff filing a lawsuit against correctional staff and stating doing so was a big mistake.  (Motion at 3; Lamon Decl. ¶ 17.)

On February 22, 2008, Defendants Osborne and the IDTT reminded Plaintiff of their earlier admonishments that they would not get involved in Plaintiff's hassles with custody and voiced their anger over having sued them by way of amended complaint.  Plaintiff was taunted as they ordered he be administered "liquid" Risperidone despite Plaintiff's acceptance of Risperidone in tablet form. (Motion at 2; Lamon Decl. ¶ 22.)

Despite the fact that Defendant Talisman was not physically present at the February 22, 2008, meeting, Talisman was nonetheless a member of the committee and was in routine communication with all its members.  During his testimony at the administrative law hearing regarding the involuntary medication of Plaintiff, Defendant Talisman agreed to having some personal responsibility for initiation of the petition.  (Motion, at 2; Lamon Decl. ¶ 23.)

On April 2, 2008, during his testimony at the administrative hearing on the petition to involuntarily medicate Plaintiff, Defendant Talisman blatantly admitted that the initiation of the

19

petition was specifically related to the subject matter content in his writings to the court involving civil rights lawsuits against him and other Corcoran prison staff.  (Motion at 2: Lamon Decl. ¶ 24.)

### F.    Summary of Defendants' Opposition and Cross-Motion

Defendants argue that Plaintiff's motion for summary judgment should be denied and their cross-motion for summary judgment should be granted.

In opposition to Plaintiff's motion for summary judgment, Defendants argue that Plaintiff has failed to present admissible evidence to support his claims.  Plaintiff's evidence consists mainly of his own declaration and the declarations of several inmate witnesses.

In their motion for summary judgment, Defendants argue that Plaintiff has no evidence that any of the alleged events occurred, or that his claims are anything more than "fanciful," "fantastic," or "delusional," and Plaintiff's allegations are contradicted by his mental health records.  Plaintiff's mental health records demonstrate that Dr. Talisman's and Dr. Osborne's treatment recommendations and medical opinions concerning Plaintiff were motivated solely by their desire to treat Plaintiff's well-documented and serious mental health issues.  And there is no evidence that officer Magvas tampered with Plaintiff's food or deprived him of his property.  Thus, there is no basis to Plaintiff's claim that any Defendant retaliated against him.

### G.    Findings

Plaintiff's retaliation claim is only viable if he can demonstrate every element of his retaliation claims against Defendants.  S. Cal. Gas Co., 336 F.3d at 888.  Based on all the evidence presented in connection with the pending cross-motions for summary judgment, and for the reasons stated below, the undersigned finds that Plaintiff's motion for summary judgment should be denied.  The undersigned further concludes that Defendants' motion for summary judgment should be granted.

#### 1.    Plaintiff's Motion for Summary Judgment

Plaintiff bears the burden of proof at trial and to prevail on his motion for summary judgment against Defendants, Plaintiff must affirmatively demonstrate that no reasonable trier of fact could find other than for him.  Soremekun, 509 F.3d at 984.  If Plaintiff meets his initial burden, Defendants are required to set forth specific facts showing there is a genuine issue for trial.  Id.

In this instance, the Court finds that Plaintiff has not met his burden as the moving party. Plaintiff must show that his constitutionally protected conduct was a substantial or moving factor in the decision to take adverse action against him, and that there were no legitimate correctional purposes moving the actions for which he complains.  Plaintiff's motion for summary judgment is not supported by evidence, by way of undisputed facts which shows that Defendants took adverse action against him because he engaged in protected conduct, or that the actions of Defendants did not further legitimate correctional goals.  Viewed in the light most favorable to Defendants, Plaintiff's failure to support his motion for summary judgment with evidence to establish that no reasonable trier of fact could find other than for him that Defendants retaliated against him, Plaintiff's motion for summary judgment must be DENIED.

       2.      Defendants' Motion for Summary Judgment

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d at 387.  Considering the facts in the light most favorable to Plaintiff, Comite de Jornaleros, 657 F.3d at 942, Defendants have proven an absence of evidence to support Plaintiff's claim, In re Oracle Corp. Securities Litigation, 627 F.3d at 387.

       a.      **Diagnosis as Delusional and Paranoid**

Plaintiff contends that Dr. Talisman and Dr. Osborne coerced and intimidated him into taking unnecessary psychiatric drugs, and they threatened to involuntarily medicate him in order to dissuade Plaintiff from falsely claiming to be suicidal so he could transfer from his assigned housing unit to the ACH mental health crisis bed unit (MHCU).  Plaintiff further contends that he complained to Dr. Talisman and Dr. Osborne that he was being abused by custody staff and was a victim of "Corcoran's shadow-policy of retaliation and silence," but they ignored him complaints and told him they were tired of his complaints and refused to accept evidence in support of such complaints.  Rather, Plaintiff contends in response that Dr. Talisman and Dr. Osborne falsely diagnosed him as delusional.

On February 19, 2008, Plaintiff filed an amended complaint in a federal lawsuit and added Dr. Talisman and Dr. Osborne as defendants in the action.  Plaintiff contends Dr. Talisman and Dr. Osborne retaliated against him by falsifying his medical records and ordered that he be placed on

21

involuntary and invasive drug treatment.  Thereafter, on February 22, 2008, Plaintiff was sent to the

hospital for suicidal ideations, and Plaintiff contends he saw Dr. Osborne and Dr. Cohen who told him

they wanted to hold him for a few days, and replaced his prescription for Risperidone tables with

liquid Risperidone.  When Plaintiff refused to take the liquid Risperidone, Dr. Osborne and Dr. Cohen

ordered Plaintiff to be strapped down in five-point restraints and ordered that he temporarily be

administered involuntary medication.  Plaintiff further contends that Dr. Talisman retaliated against

him on April 2, 2008, by testifying in support of a petition seeking to involuntarily medicate Plaintiff

with Zyprexa for five months.  Plaintiff claims involuntary treatment was not necessary, and Dr.

Talisman's testimony was based on his falsified medical records.

First, to the extent that Plaintiff acknowledges that he falsely threatened suicide in order to

manipulate his prison housing assignment to gain a transfer to the hospital so he could present Dr.

Talisman and Dr. Osborne with evidence that he was being abused by custody staff, such conduct is

not protected by the First Amendment to support a claim for retaliation.  See e.g., Fitzgerald v. Greer,

No. 07-C-61-C, 2007 WL 5497185 at *2 (W.D. Wis. Oct. 3, 2007) (lying about one's medical status is

not protected by the First Amendment); see also Solano v. Playgirl, Inc., 292 F.3d 1078, 1089 (9th Cir.

2002) (the First Amendment does not protect knowingly false speech) (citing New York Times Co. v.

Sullivan, 376 U.S. 254, 179-280 (1964)).

Second, Plaintiff's claim relating to the abuse by custody staff and Plaintiff's amendment of

his federal lawsuit to include Dr. Talisman and Dr. Osborne fails because there is no evidence that

such conduct by Plaintiff was a "substantial and motivating factor" in the treatment decisions by Dr.

Talisman and Dr. Osborne relating to Plaintiff's mental health care.

The undisputed evidence demonstrate that Plaintiff suffers from schizoaffective disorder

(dating back to his adolescence), which is characterized by delusional, or false, fixed beliefs that have

no basis in reality.  Plaintiff has suffered with the mental illness well before any treatment by Dr.

Taliman and Dr. Osborne, and Plaintiff has been a participant in CDCR's MHSDS, consistently

cycling through all four increasingly restrictive levels of care.  Upon Plaintiff's arrival at Corcoran on

February 23, 2006, he was placed almost immediately into a MHCB because he attached a homemade

noose to the vent in his cell and threatened to hang himself.

To this end, Plaintiff also attempted suicide in 1992 by setting his cell on fire.  And, Plaintiff's medical history reveals that he previously attempted suicide by hanging, swallowing razor blades, driving a car into a wall, and jumping from a freeway overpass.  (ECF No. 118, Decl. of Talisman, Ex. A; MHR0134, MHR0338.)   Thus, Plaintiff has a history of suicide attempts.  From the time Plaintiff arrived at Corcoran in 2006 to February 22, 2008 (when procedures to involuntarily mediate Plaintiff were initiated), Plaintiff was hospitalized in a MHCB fourteen times for suicidal or homicidal ideations.  During this time frame, Plaintiff complained often regarding his suspicions that custody staff was tampering with or poisoning his food in retaliation for his litigation activities as well as his numerous complaints about staff, and Plaintiff vacillated between being medication complaint and refusing his prescribed psychotropic medication.  Plaintiff's medical reports reveal that even before Plaintiff arrived at Corcoran, Plaintiff was under the belief that staff at California State Prison, Sacramento were tampering with and poisoning his food.  (Decl. of Talisman, Ex. A; MHR0006-0007, MHR0009, MHR0015.)   Plaintiff's complaints regarding his food were not substantiated by any medical examination, and were characterized by nearly every mental health care professional who examined him as paranoid, delusional, obsessive, and without basis in reality or medicine.

The undisputed evidence demonstrates that Dr. Talisman and Dr. Osborne's treatment recommendations and medical opinions regarding Plaintiff's mental illness were motivated only by their desire to treat Plaintiff's long-standing and well-documented mental health issues, and there is no evidence to support a finding that either Dr. Talisman or Dr. Osborne falsely diagnosed, falsified medical records, or punished Plaintiff for any reason.  Mere suspicion or speculation regarding involvement does not suffice; Plaintiff must come forth with some evidence of causation and he has not done so.  Retaliatory motive is not established simply by showing adverse action by a defendant after protected conduct; rather, Plaintiff must show a nexus between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the "logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this.'")  Accordingly, Dr. Talisman and Dr. Osborne are entitled to summary judgment on this claim.

///

///

23

### b.     Involuntary Medication

After Plaintiff repeatedly reported suicidal ideations and refused to take his prescribed

psychotropic medication, a Keyhea process was initiated on February 25, 2008.  A Probate Code 2602

order also known as a Keyhea order is a court-issued injunction for involuntary medication of an

inmate who, due to a mental disorder, is incompetent to refuse medication.

### (1).     Doctor Osborne

Contrary to Plaintiff's contention, Dr. Osborne, as a clinical psychologist, did not treat Plaintiff

on February 22, 2008, and played no role in the decisions to involuntarily medicate him.  It is

undisputed that Dr. Osborne's treatment of Plaintiff between February 2006 and February 2008

consisted primarily of meeting with Plaintiff to discharge him from the MHCB and to order follow-up

treatment upon his discharge.  Dr. Osborne also authorized admitting Plaintiff to a MHCB several

times, and she twice referred him for impatient treatment at a Department of Mental Health Facility

because Plaintiff exhibited paranoid and bizarre delusions regarding his food.  Dr. Osborne, as a

clinical psychologist, is not authorized to prescribe medication or order a patient involuntarily

medicated.  Plaintiff's attempt to dispute this fact with his personal opinion to the contrary does not

and cannot create a dispute of material fact.

Indeed, it is undisputed that Plaintiff's mental health records demonstrate that Dr. Cohen,

alone, issued orders to discontinue Plaintiff's Risperidal and replace it with Zyprexa.  (Decl. of

Talisman ¶ 18, Ex. A; MHR0360.)  It was also Dr. Cohen who ordered Plaintiff to be involuntarily

medicated for seventy-two hours, and thereafter ordered Plaintiff to be placed in five-point restraints.

(Id., Ex. A; MHR0361, MHR0371.)  Thereafter, on February 25, 2008, Dr. Cohen extended Plaintiff's

involuntary medication order by twenty-one days.  (Id., Ex. A; MHR0383, MHR0385, MHR0392.)

Plaintiff met with the IDTT later that day (of which Dr. Osborne was not a member), and the team

determined that the Keyhea process for long term involuntary medication should be initiated because

Plaintiff posed a danger to himself.  Dr. Osborne was not present and did not participate in any of

these decisions, and there is no evidence to the contrary.  Thus, there is no evidence to support

Plaintiff's claim that Dr. Osborne ordered replacement of Plaintiff's Risperidone tablets with liquid

1    Risperidone, ordered Plaintiff placed in five point restraints, and ordered Plaintiff to be involuntarily

2    medicated, and Dr. Osborne is entitled to summary judgment on this claim.

3         (2).    Doctor Talisman

4         As to Dr. Talisman, there is no evidence to support the finding that Dr. Talisman retaliated

5    against Plaintiff by testifying at the April 2, 2008, Keyhea hearing in support of involuntary

6    medication.

7         Between 2006 and 2008, Plaintiff visited the In-Patient Psychiatric Unit at the JDKM Hospital,

8    where Dr. Talisman worked, on numerous occasions both as an inpatient and outpatient.  During that

9    time, Dr. Talisman treated Plaintiff directly, but also interacted with Plaintiff even when he was not

10   providing direct treatment to him.  Dr. Talisman was very familiar with Plaintiff's mental health

11   records as well as his mental health diagnosis and treatment history.  On February 2, 2008, Plaintiff

12   refused his psychotropic medication.  As discussed above, Dr. Cohen ordered Plaintiff to be

13   involuntarily medicated the following days when Plaintiff continued to refuse his medication.

14        Dr. Talisman was a member of the IDTT who subsequently decided that a Keyhea hearing

15   (long-term involuntary medication), should be initiated for Plaintiff on February 25, 2008.  Dr.

16   Talisman, along with other members of the team, believed that Plaintiff posed a danger to himself, and

17   was not competent to refuse medication.  Dr. Talisman worked with counsel for CDCR in preparing a

18   petition requesting an order directing Plaintiff be involuntarily medicated, and Dr. Talisman provided

19   a declaration in support of the petition, and testified at the hearing on the petition.   Contrary to

20   Plaintiff's claim, Dr. Talisman's testimony at the Keyhea hearing was based on Plaintiff's long-

21   standing history of mental illness and his medical opinion that Plaintiff posed a danger to himself

22   without proper medication.  Plaintiff objects to Dr. Talisman's declaration under Rule 801 of the

23   Federal Rules of Evidence as inconsistent with testimony provided at the April 2, 2008 hearing.

24   Plaintiff's objection must be overruled.  Plaintiff misconstrues the testimony offered by Dr. Talisman

25   at Plaintiff's Keyhea hearing.  The transcript of the hearing, attached to Plaintiff's complaint, does not

26   demonstrate that Dr. Talisman recommended Plaintiff be involuntarily medicated based on Plaintiff's

27   court filing.  Rather, Dr. Talisman testified and recommended that Plaintiff be involuntarily medicated

28   due to the severity of his mental illness, Plaintiff's inability to competently weigh the risks of refusing

his medication, and the danger Plaintiff posed to himself.  (ECF No. 118-4 at 7.)  Plaintiff's bare assertion that Dr. Talisman testified to retaliate against Plaintiff for lawsuits is unfounded and not supported by any evidence.

In opposition, Plaintiff acknowledges that he had been admitted to the MHCU for suicidal ideations on at least fourteen occasions prior to February 21, 2008, but argues he had never been involuntarily medicated.  Consequently, Plaintiff contends that Dr. Talisman has failed to carry his burden of establishing the involuntary medication was based purely on the need for mental health treatment.  The fact that Plaintiff may have never been subjected to involuntarily medication is not relevant and does not create a material issue of fact that such action was done in retaliation for Plaintiff's engaging in a lawsuit.

In order to avoid summary judgment, Plaintiff must come forth with evidence of impermissible motive; Plaintiff may not rely on his mere conclusory assertions of retaliatory motive.  There is no evidence that Dr. Talisman's testimony in support of involuntary medication at Plaintiff's Keyhea hearing was based on anything other than his professional medical opinion, and there is no evidence to support Plaintiff's claim that Dr. Talisman's decision was done in retaliation for Plaintiff's exercising his rights under the First Amendment.  Accordingly, Dr. Talisman is entitled to summary judgment on this claim.

In sum, while Plaintiff may point to the fact that Dr. Talisman and Dr. Osborne were aware of Plaintiff's litigation activities and possibly the fact that they were named as Defendants in a pending federal lawsuit, there it not even a scintilla of evidence that Defendants retaliated against Plaintiff for exercising his rights under the First Amendment.  There is insufficient evidentiary support for Plaintiff's claim that the engagement in a lawsuit was the substantial or motivating factor behind his involuntary medication.  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact" precluding summary judgment); Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) ("a mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must

introduce some significant probative evidence tending to support the complaint.")  Accordingly, Defendants Dr. Talisman and Dr. Osborne are entitled to summary judgment.

### c.        Tampering of Food, Destroying/Stealing Property, Cell Reassignment

Plaintiff contends that after he filed an amended complaint in a federal lawsuit, which named officer Magvas as a Defendant, Magvas verbally berated him, called him names, and served Plaintiff food "in a chemically-saturated glob" on February 20 and 21, 2008.  In addition, Plaintiff contends that on February 21, 2008, officer Magvas told Plaintiff he was tired of his "lawsuit bullshit" and falsely reported that Plaintiff was suicidal in order to have him removed from the building.  After Plaintiff was taken to the hospital, Magvas immediately stripped Plaintiff's cell so it could be given away, and falsely claimed that Plaintiff did not have a television despite the visible television.  When Plaintiff's property was returned to him on April 9, 2008, Plaintiff contends his television, legal documents, books, and various other items were missing.

### (1).        Tampering of Food

Defendant Magvas denies ever tampering with Plaintiff's food, and Plaintiff has submitted no admissible evidence linking Defendant to any acts of food contamination.  Officer Magvas declares that the kitchen staff prepares all of the food for the inmates.  (ECF No. 118-2, Decl. of Magvas ¶ 10.)  This process is completed off-site, away from the 4B2R housing unit.  (<u>Id.</u>)  Kosher meals are delivered to the housing unit pre-packaged and completely sealed on a metal tray.  (<u>Id.</u> ¶ 11.)  Officers in the housing unit have no contact with the food on the Kosher meal trays.  (<u>Id.</u>)  For regular meals, after the food is prepared, it is delivered to each housing unit in large pans.  (<u>Id.</u> ¶ 12.)  The officers on duty then put the food on individual meal trays.  (<u>Id.</u>)

Both the Kosher and regular meals are stacked onto meal carts for delivery to the inmates.  (<u>Id.</u> ¶ 13.)  The officers then deliver a meal tray from the cart to each inmate in his cell.  (<u>Id.</u>)  Multiple officers are involved with the distribution of the meal traps simultaneously, so that all of the SHU inmates receive their food in a timely and efficient manner.  (<u>Id.</u>)  The meals trays are stacked onto multiple, identical cars, and there is no way to know with certainty which meal tray will be delivered to which inmate.  (<u>Id.</u>)

Magvas recalls that Plaintiff received both regular and Kosher meals during his housing assigned in 4B2R.  (Id. ¶ 14.)  Magvas declares that he never tampered with or poisoned any of Plaintiff's meals or food.  (Id. ¶ 15.)  Magvas does recall that on February 21, 2008, Plaintiff threw the entire meal under his door onto the tier.  (Id.)  On that day, Magvas had issued Plaintiff his Kosher meal at approximately 7:00 a.m., which Plaintiff inspected and accepted without incident.  (Id.)  Because Plaintiff had previously engaged in this type of behavior, Magvas recommended that he be evaluated by mental health staff.  (Id.)

It is undisputed that Plaintiff's complaints regarding his food can be attributed to his schizoaffective disorder diagnoses, as such paranoid and delusional fixed beliefs are a classic symptom of the disorder.  Plaintiff's submission and reference to a Corcoran Operating Procedure does not refute Defendant Magvas's declaration that he did not have an opportunity to tamper with Plaintiff's meals, and there is no admissible evidence to create a disputed of material fact that Defendant Magvas tampered with Plaintiff's meals on February 21, 2008, in retaliation.  "Mere allegation and speculation do not create a factual dispute for purposes of summary judgment." Soremekun v. Thirty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Nelson v. Pima Community College, 83 F.3d 1075, 1081-1082 (9th Cir. 1996)).  Accordingly, Defendant Magvas is entitled to summary judgment on this claim.

(2).    Destroying/Stealing Property and Cell Assignment

Officer Magvas declares that (although he does not expressly remember) on February 21, 2008, at approximately 9:00 a.m., Plaintiff stated to him that he was suicidal, that he needed help, and that he needed to talk to someone.  (ECF No. 120-1; Supp. Decl. of Magvas ¶ 2, Ex. A.)  Magvas declares that the chrono dated February 21, 2008, signed by him is consistent with his practice to immediately remove a suicidal inmate from his cell, escort him to the rotunda of the housing unit, and notify the psychiatric technician on duty so that the inmate could be further evaluated.  (Id. ¶ 3.)  Magvas further declares that he would only report an inmate expressing suicidal ideations if he actually expressed to him that he felt suicidal.  (Id. ¶ 4.)  He would not, and has never, reported an inmate to be suicidal in order to punish the inmate for any reason or manipulate the inmate's housing placement in any way.  (Id.)

When Plaintiff was sent to the hospital and removed from his housing unit on February 21, 2008, Magvas had no independent authority to determine how long Plaintiff's cell should be retained, to reassign Plaintiff's cell, or to decide Plaintiff's property should be inventoried, boxed, and stored. (ECF No. 118, Decl. of Magvas ¶¶ 3, 8.)  On this day, the building sergeant ordered Magvas to inventory and box Plaintiff's property, which was done in accordance with CDCR rules and regulations.  (Id. ¶ 9, Ex. A.)  Magvas completed a property inventory form and noted that the buttons on Plaintiff's television had been altered.  (Id.)  Magvas also noted that he boxed up Plaintiff's legal and personal papers.  (Id.)  Magvas specifically declares that he did not steal or destroy any of Plaintiff's property.  (Id.)  Indeed, it was officer Magana, not officer Magvas, who refused to issue the contraband items and Plaintiff signed such property form on April 9, 2008.  (ECF No. 118-3, Decl. of Kearns, Ex. B at 0004-0005.)  Plaintiff was provided an opportunity to mail the contraband property items home, but he refused to sign and complete the Trust Account Withdrawal form, and his property was later disposed of pursuant to CDCR's rules and regulations.  (Id., Ex B at 0003, 0007.)

Plaintiff's claim that because Magvas declares that he was "responsible for facilitating the daily routine of the SHU inmates," Magvas was responsible for Plaintiff's cell assignment is evidentiary support.  As officer Magvas declares he had no authority over inmate cell assignment, and Plaintiff has presented no evidence to contrary.  Accordingly, Defendant Magvas is entitled to summary judgment on this claim.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Plaintiff's motion for summary judgment be DENIED; and

2. Defendants' motion for summary judgment be GRANTED in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time

may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **July 13, 2015**

UNITED STATES MAGISTRATE JUDGE